IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MICHAEL D. WOLFE,                )
                                 )
              Plaintiff,          )        4:06CV3146
                                 )
         v.                      )
                                 )
MICHAEL J. ASTRUE,              )        MEMORANDUM AND ORDER
Commissioner of the Social       )
Security Administration,         )
                                 )
              Defendant.          )
_____

        Pursuant to the parties' consent, this case is pending
before me for final disposition.[1]  The plaintiff, Michael D.
Wolfe ("Wolfe") has appealed the decision of the defendant,
Michael J. Astrue,[2] the Commissioner of the Social Security
Administration ("Commissioner"), denying his request for social
security disability insurance benefits and supplemental security
income benefits.  After carefully reviewing the record, I
conclude that the Commissioner's decision should be affirmed.

I.   PROCEDURAL BACKGROUND

        Wolfe applied for social security disability benefits on
March 9, 2004.  Wolfe claims depression, anxiety disorder
NOS, degenerative joint disease, and a history of polysubstance
abuse in remission rendered him disabled and unable to work since

_____

        [1]See filing 5, "Consent to Exercise of Jurisdiction by a
United States Magistrate Judge."

        [2]On February 12, 2007, Michael J. Astrue became the
Commissioner of Social Security.  Michael J. Astrue should be
substituted for Commissioner Jo Anne B. Barnhart as the
defendant, (Fed.R.Civ.P. 25(d)(1), and this suit shall proceed
pursuant to the last sentence of section 205(g) of the Social
Security Act, 42 U.S.C. § 405(g).

January 11, 2004.  AR 66-68.  His application for disability
benefits was denied initially on July 7, 2004, (AR 29-32), and
upon reconsideration on September 2, 2004.  AR 35-39.

     Wolfe filed a hearing request on October 6, 2004, (AR 40),
and the hearing was held before an Administrative Law Judge
("ALJ") in Grand Island, Nebraska on August 22, 2005.  Testimony
was received from Wolfe, and from a vocational expert and a
medical expert who appeared at the ALJ's request.  AR 12, 57-65,
282.  The ALJ's adverse decision was issued on December 30, 2005,
(AR 12-24), and Wolfe's request for review by the Appeals Council
was denied on April 27, 2006.  AR 4-6.  Wolfe's pending complaint
for judicial review and reversal of the Commissioner's decision
was timely filed on June 19, 2006.  Filing 1 (Complaint).

                    II.   THE ALJ'S DECISION.

     The ALJ's decision evaluated Wolfe's claims through
all five steps of the sequential analysis prescribed by 20 C.F.R.
§§ 404.1520 and 416.920.  AR 12-24.  The ALJ made the following
findings:

   1.   Wolfe met the special earnings requirements under Title
        II of the Social Security Act on January 11, 2004, and
        continues to meet them;

   2.   Wolfe has not engaged in substantial gainful
        activity since January 11, 2004;

   3.   The record establishes that Wolfe has depression, an
        anxiety disorder NOS, degenerative joint disease, and a
        history of polysubstance abuse in remission;

   4.   Although Wolfe's medically determinable impairments,
        either singly or collectively, impose some limitations
        upon his ability to perform work-related functions,
        they have not revealed the same or equivalent attendant

                                2

medical findings as are recited in Appendix 1 to
Subpart P of the Social Security Administrations'
Regulation No. 4.  Specifically, the ALJ found that
Wolfe should avoid exposure to concentrations of
vibration, cold and noise, and is moderately limited in
his ability to:

- respond to change in the work setting;

- get along with co-workers and peers without being
  distracted or exhibiting behavorial extremes;

- complete a normal work day or work week without
  distractions from psychologically based symptoms;

- perform at a consistent pace without an
  unreasonable number and length of rest periods;

- work in proximity to others without distraction;
  and

- maintain attention and concentration for extended
  periods of time.

The ALJ noted that while Wolfe claimed to suffer from a
significant military-related hearing loss, he was able
to hear the ALJ throughout the hearing without wearing
hearing aids.  The ALJ found Wolfe remains able to:

- occasionally lift and carry up to 20 pounds;

- frequently lift and carry 10 pounds;

- sit, stand, and walk for up to 6 hours in an 8-
  hour work day with normal breaks;

- work an 8-hour day;

- work without extremity mobility limitations in
  either his left or right hand;

- occasionally bend, stoop, and squat; and

- remember, understand, and carry out simple but not
  detailed instructions.

3

5.  Due to the limitations caused by his medically
    determinable impairments, Wolfe is unable to perform
    his past relevant work as a baker/dough divider.

6.  Despite his medically determinable impairments, Wolfe
    possess the residual functional capacity for other work
    that exists in the regional and national economies in
    significant numbers.

7.  To the extent he attempted to establish total
    disability through hearing testimony, Wolfe was not
    credible;

8.  Wolfe is not disabled, as that term is defined under
    the Social Security Act;

9.  Wolfe is not entitled to a period of disability or to
    the payment of disability insurance benefits under
    Title II of the Social Security Act;

10. Wolfe is not eligible for the payment of supplemental
    security income benefits under Title XVI of the Social
    Security Act.

AR 22-24.


III.   ISSUES RAISED FOR JUDICIAL REVIEW.


Wolfe's complaint requests judicial review of this decision.
He raises the following arguments in support of his claim for
reversal of the Commissioner's determination:


•   The ALJ failed to accept as controlling the limitations
    and restrictions placed upon the plaintiff by his
    treating physician, Michael G. Skoch.

•   The ALJ failed to give the opinions of Dr. Skoch the
    greatest weight based on his examining relationship,
    his treatment relationship, frequency of treatment and
    the nature of the treatment, the supportability of his
    opinions, and their consistency with the record as a
    whole.

•   The ALJ failed to develop a thorough record.

4

- The ALJ failed to properly assess the plaintiff's testimony as required under Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) when determining the credibility of the plaintiff's subjective complaints.

Filing 11 (Claimant's brief), p. 5.

In response, the Commissioner argues that although Dr. Skoch is a treating physician, his opinions were not entitled to controlling weight or substantial deference because they were internally inconsistent, were inconsistent with plaintiff's self-reported symptoms, and were based on examinations performed only twice a year. The Commissioner claims the record was adequately developed with regard to those conditions forming the basis of plaintiff's claimed disability, and therefore the ALJ was not obligated to order further examinations and tests of plaintiff's intellect and memory. Finally, the Commissioner argues the ALJ properly evaluated the plaintiff's credibility, and since this credibility determination is supported by the record as a whole, the ALJ's decision should be affirmed.

IV.   THE RECORD AND PROCEEDINGS BEFORE THE ALJ.

At the time of his hearing, Wolfe was fifty-four years old. He had graduated from high school, was able to read, write, and speak English, and was able to handle his own finances. AR 272, 293, 295-96. From 1990 until January 2004, Wolfe worked as a dough divider for Sara Lee Bakery. AR 296.

Wolfe claims his disability began on January 11, 2004. AR 272. Wolfe entered substance abuse treatment at Valley Hope on January 12, 2004 and was released to outpatient care on February 13, 2004. AR 154-5, 307. His Global Assessment of Functioning

("GAF") when he entered the program was 38.[3]  AR 154-5.  MMPI-2
testing was performed on January 14, 2004, January 30, 2004, and
February 16, 2004.  The January 14 testing was likely invalid,
and the February 16 testing was "probably caused by exaggeration
of symptoms due to a cry for help or possible malingering."  AR
163, 171.  The January 30, 2004 testing revealed a valid profile
for clinical depression, with symptoms of anxiety, guilt, and
moodiness.  AR 167.

Wolfe began receiving chiropractic care for pain and
stiffness in his neck and low back pain in February of 1988.  AR
178.  On February 25, 2004, he saw Dr. John L. Worden, IV for
complaints of pain and stiffness in his joints.  Doctor Worden
noted Wolfe was sitting up "in no acute distress," "has only
about 3 or 4 of the fibromyalgia tender points," and "has no
significant tenderness of his lumbar spine or cervical spine
where he complains of pain."  AR 253.  Dr. Worden prescribed
Zoloft and Zyprexa for Wolfe's complaints of depression, and
Lisinopril for his high blood pressure.  He was advised to use
Tylenol and sports creme for his pain.  AR 253.

Wolfe received a mental health evaluation at the Moscati
Health Center on February 27, 2004.  Wolfe stated he was
"currently working on getting disability at SSI,". . . "but will

---

[3]Global assessment of functioning (GAF) is the clinician's
judgment of the individual's overall level of functioning, not
including impairments due to physical or environmental
limitations.  A GAF of 31 through 40 is characterized by some
impairments in reality testing or communication (e.g., speech is
at times illogical, obscure, or irrelevant) OR major impairments
in several areas, such as work or school, family relations,
judgment, thinking, or mood (e.g. depressed man avoids friends,
neglects family, and is unable to work. . . ).  See American
Psychiatric Association, Diagnostic and Statistical Manual of
Mental Disorders, at 34 (4th ed. 2000)("DSM-IV-TR")

be going back to work in a couple of weeks." AR 176. Wolfe
explained he was scheduled to return to work at Sara Lee on March
12, and though "he doesn't like the people at work," "they demand
perfectionism," and "his body is wore out," "it's a good job."
AR 177. Wolfe's GAF at the time of his February 27, 2004
evaluation was 55.[4]

A consulting psychological evaluation was performed by Alan
J. Smith, Ph.D. on May 4, 2004. Though Wolfe presented with
hypomania, possibly methamphetamine-induced or a symptom of
premorbid bipolar disorder, his GAF was 52. Wolfe reported to
Dr. Smith that his symptoms were managed fairly well with
medication. Dr. Smith concluded that despite some limitations in
occupational capabilities, Wolfe continued to have several
occupational skills that have historically rendered him able to
engage in long-term employment. He opined that Wolfe's prognosis
for occupational adaptation was fair to good since his
medications were successfully managing his mood disorder, noting
that an updated review of Wolfe's medications was probably
warranted. AR 179-85.

Dr. Frederick Catlett performed a consulting medical
examination of Wolfe on May 5, 2004. Dr. Catlett noted that
Wolfe has osteoarthitic changes in the spine and that past
injuries had caused a shortened left leg and a deformed second
toe on Wolfe's right foot. However, Wolfe was not using any

---

[4]A GAF of 51 through 60 is characterized by moderate
symptoms (e.g., flat affect and circumstantial speech, occasional
panic attacks) or moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peers or
coworkers). See American Psychiatric Association, Diagnostic and
Statistical Manual of Mental Disorders, at 34 (4th ed.
2000)("DSM-IV-TR").

7

brace, crutch, or wheelchair to ambulate.  Although Wolfe
complained of "fibromyalgia," back and neck pain, and hip
dislocations, upon thorough examination by Dr. Catlett, Wolfe
ambulated well during the exam and was able to lie down, sit up,
and climb off and on the examination table without problems.  Dr.
Catlett palpated Wolfe's shoulders, upper back, anterior thigh,
and hips, but Wolfe could not identify any trigger point he
considered unusually tight, tender, or painful.  During the
course of the examination, Wolfe told Dr. Catlett that he cleans
and vacuums his home, mows the yard twice a week (one to one and
a half hours each time), and maintains a "fair-size" vegetable
and flower garden.  Dr. Catlett noted Wolfe had a fairly dark tan
on his chest and back from being outdoors.  AR 187-93.

On May 24, 2004 Wolfe contacted Dr. Worden's office for
renewal of his Zoloft prescription.  In response to this request,
Dr. Michael Skoch performed a "med check" examination of Wolfe's
"bipolar affective disorder and anxiety" on May 28, 2004.  Dr.
Skoch noted Wolfe was a bit anxious, but was alert, oriented, and
appropriate, with no evidence of psychotic thinking,
hallucinations, or delusions.  AR 253.  Wolfe's prescriptions
were renewed, including a prescription for Naprosyn.  Wolfe was
scheduled to see Dr. Worden on June 30, 2004, but failed to keep
this appointment.  AR 253.

On October 20, 2004, Wolfe was examined by Tami Belz, APRN[5]
to recheck his medications.  At that time, Wolfe reported that he
"feels dumpy all the time" and has fibromyalgia.  The treating
medical provider observed that Wolfe was alert and in no acute
distress.  Though he complained of body aches, no pain was

---

[5]Advanced Practice Registered Nurse.  See Neb. Rev. Stat. §
71-17,131 et. seq.

elicited upon palpation.  Wolfe's Zoloft and Zyprexa
prescriptions were discontinued and replaced with Symbyax and
Wellbutrin, and his Naprosyn and Lisinopril prescriptions
renewed.  Wolfe was advised to return in three weeks for a
followup appointment--sooner if problems or concerns arose.  AR
252.

    Wolfe returned two weeks later and was examined by APRN Belz
for a recheck of his medications.  In response to Wolfe's
continuing complaints of anxiety, his Symbyax prescription was
increased.

    Wolfe saw Dr. Skoch on November 19, 2004 for a mental
capacities evaluation and disability assessment.  See AR 238-47,
252.   Dr. Skoch concluded "I don't believe Mr. Wolfe could
function adequately to work full-time.  His distractabilty,
fatigue, and anxiety would prevent full-time employment."  AR
244.  Dr. Skoch's physical capacities evaluation of Wolfe stated
Wolfe could work 40 hours a week and noted that "[from a physical
capacity standpoint, Mr. Wolfe has few significant limitations
apart from his subjective complaint of pain from his
fibromyalgia."  AR 235-37.  At his disability hearing, Wolfe
testified that he sees Dr. Skoch twice a year.  AR 311.  In
completing the Mental Impairment and Medical Impairment
Evaluation forms for Wolfe, Dr. Skoch acknowledged that he had
not seen Wolfe on a regular basis.  AR 232, 238.  Based on the
record before me, Dr. Skoch did not see, treat, or evaluate Wolfe
after November 19, 2004.

    Wolfe was again seen on December 8, 2004 by APRN Belz for a
medication recheck.  He reported that his medications were
working well, although he still felt anxious in the evening.  He

9

requested additional medication to help him relax, and his
Symbyax prescription was again increased.  AR 251.  Wolfe
reported that he was in the process of actively searching for a
job.  AR 270.  However, in a letter to Wolfe's counsel dated
December 9, 2004, Wolfe's mental health counselor, Virginia
White,[6] opined that "[q]uite frankly, in this condition, I do not
see that he would be able to hold much of a job, in fact, a part
time job might not even work out for him."  AR 228.

    The December 2004 medication changes were apparently helpful
in treating Wolfe's anxiety.  On January 7, 2005, Wolfe reported
to Ms. White that he believed he would be hired by the new Super
Wal-Mart when it opened its bakery department.  AR 269.  In fact,
he began that job in late January, and worked full-time for Wal-
Mart until April 8, 2005.  When Wolfe was treated by APRN Belz
for an infected toe on February 3, 2005, he reported that "since
his Symbyax was increased in December that he does feel
improved."  AR 251.  However, his Wellbutrin prescription was
increased four days later when, during a recheck of the infected
toe, he claimed his main concern was that he feels "dumpy and
depressed" and "always sluggish."  As of late March 2005, he was
reportedly "much more relaxed than [] he has been in a long
time."  AR 264.

    Wolfe did not, however, like his job at Wal-Mart because he
did little baking, a lot of cleaning, and had to work in a
confined space.  AR 263-64.  He worked long hours at Wal-Mart
getting ready for its grand opening.  He stated "he wished he had
signed up for a Greeter instead of the doughnut job," that "he
has to get up at 3:00 a.m. now and go to work and make

---

[6]Virginia K White RN, MS, EDS is a Licensed Mental Health
Practitioner (LMHP).  See AR 228; Neb. Rev. Stat. § 71-1,308.

doughnuts," "everything has to be so clean," he will have to
"cross train to do cakes as well," and he hoped he was able to do
the job.  AR 255.  He stated did not like some of Wal-Mart's
rules, but had to follow them.  AR 255.

Wolfe quit the Wal-Mart job on April 8, 2005, reportedly
because he "was overwhelmed and knew he was too stressed out to
continue working there.  He had become more depressed and felt he
had no choice."  He stated, "I hope I made the right decision,
but I just couldn't do it anymore."  AR 262.  He also complained
to his counselor of memory loss, stating he could not learn all
the policies and procedures required by Wal-Mart.  AR 262, 259.
At his disability hearing, Wolfe testified that he quit the Wal-
Mart job because it required too much bending and stooping, was
too high paced, there was too much to remember, and he believed
he would ultimately be fired if he attempted to stay.  AR 306,
309.

At the outset of his counseling appointment on May 25, 2005,
Wolfe asked whether his counselor had remembered to write a
letter to his attorney in support of his social security
disability claim.  AR 259.  Ms. White's letter, dated June 6,
2005, states he quit his job at Wal-Mart due to anxiety and panic
attacks, and his inability to pass Wal-Mart's required testing on
policies and procedures.  AR 248.  The letter states she was
continuing to work with Wolfe to reduce his anxiety and bolster
his self-esteem.  When Wolfe saw APRN Belz on May 27, 2005, he
stated he did not believe Wellbutrin was working because he was
very anxious and jittery at the time.  His medications were again
adjusted, to include discontinuing the Wellbutrin prescription.
AR 250.

At his disability hearing, Wolfe testified that he can no longer work because he has fibromyalgia, with pain in his neck, back and joints, and swelling in his hands and feet.  Wolfe also testified that he is unable to concentrate and experiences memory loss.  AR 296-7.  Wolfe testified that he takes 1000 milligrams of Naprosyn twice a day, Wellbutrin, Symbyax, 20 milligrams of Zyprexa a day, 15 millgrams of Prozac a day, and Lipitor.  AR 299.  His only side effect from these medications is "cotton mouth" and "kind of a phelgmy throat."  AR 299-300.

Wolfe testified that he gets out of bed between 8:00 and 9:00 a.m., does household chores such as laundry and the dishes, and then rides bikes and lifts weights.  He experiences pain if he lifts more than 40 pounds.  Wolfe testified that he can walk around the block, but if he walks further, he develops swollen feet and aching in his back, knees, and feet.  AR 300.  He states he cannot stand for six or seven hours without pain, and he becomes stiff and achy if he sits more than an hour, so he spends three to four hours a day lying down or in a reclined position in addition to the time he spends sleeping at night.  AR 300-02.  Wolfe testified that he can reach forward and grasp, but cannot repetitively do so for more than 10 or 15 minutes without pain; can grasp a cup of coffee, but his hands swell; and can pick up small objects such as paper clips, but can only do so repetitively for five to ten minutes without stiffness in his fingers and pain in his shoulders and elbows.  AR 301-02.  Though he still does some painting and bicycling, Wolfe testified that he has lost interest in most other hobbies due to pain.  AR 302.

Wolfe testified that he has difficulty with concentration and memory, though he stated he could follow simple instructions

12

(one or two-step instructions), and could not explain any real
examples of how memory and concentration difficulties affected
his daily life.  AR 303-04.  He explained that he is nervous
around groups of people, and does not handle work stress well.
He claims he is overwhelmed and experiences panic attacks when
performing high-paced jobs or when job changes occur, but he is
bored by routine and repetitive tasks. AR 304-6.

     Dr. Thomas England, a licensed clinical psychologist who
attended the hearing at the request of the ALJ, testified that
although Wolfe complains of memory loss and confusion, based on
his records, he never underwent IQ or memory testing.  AR 46-53,
315.  He testified that Wolfe has a depressive disorder.  Dr.
England noted that several medical records state he has bipolar
disorder, but the origin of that diagnosis was unclear, and there
were no symptoms of hypermania described in the records, perhaps
because Wolfe's symptoms were well controlled by medication.  AR
316-17, 319.  In response to Dr. England's questioning, Wolfe
acknowledged that he has never experienced episodes of high
energy or excessive spending, and stated his energy level was
consistently low.  AR 310-12.  Dr. England testified that
although Wolfe's treatment records did identify symptoms of
anxiety, the precise diagnostic cause of these symptoms was
unclear and his prescribed medications were not typically used as
anti-anxiety medications.  AR 318.  Though Wolfe had a clear
history of prior drug abuse, substance addiction was not material
to any finding of disability because Wolfe was no longer using
illegal drugs and alcohol.  AR 318-19.

     The ALJ asked the vocational expert to assume someone with
Wolfe's age, education and work experience could lift up to 20
pounds occasionally and 10 pounds frequently; sit or stand for

13

six hours and day and, with normal breaks, complete an eight-hour
day; bend, stoop, kneel, and squat on an occasional basis;
use his left and right hands without limitations; and understand
and carry out simple instructions but not detailed instructions.
The ALJ asked the vocational expert to further assume Wolfe must
avoid exposure to concentrated vibration, cold and noise, and is
moderately limited (limited but still able to function
satisfactorily) in his ability to:

- respond to changes in the work setting;

- get along with co-workers or peers without distracting
  them or exhibiting behavioral extremes;

- complete a normal work day and work week without
  interruptions from psychologically based symptoms;

- perform at a consistent pace without unreasonable
  number and length of rest periods;

- work in coordination with or proximity to others
  without being distracted by them; and

- maintain attention and concentration for extended
  periods of time

AR 322. The assumptions and restrictions set forth in the
hypothetical question posed to the vocational expert were
entirely consistent with the results of Wolfe's Mental and
Physical Functional Capacity Assessments performed in June and
July of 2004. AR 196-201; 219-26. Though Wolfe had also
commented that he had a hearing loss, the ALJ noted that Wolfe
did not have hearing aids and had no difficulty hearing during
the disability proceeding. AR 321-22.

Based on the assumptions and restrictions in the
hypothetical question, the vocational expert opined that Wolfe
could not return to his past relevant work. AR 322. However,

14

she further  testified that he remains able to perform other
positions within the national economy, such as a folding machine
operator (550 regional positions and 10,000 positions
nationally), photocopy machine operator (500 regional positions
and 11,000 positions nationally), or a housecleaner or maid (4300
regional positions and 100,000 positions nationally).  AR 322-24.
 Relying on this testimony, the ALJ denied Wolfe's claim for
disability.


                        V.   ANALYSIS


     Section 205(g) of the Social Security Act, 42 U.S.C. §
405(g), provides for judicial review of a "final decision" of the
Commissioner under Title II, which in this case is the ALJ's
decision.  A denial of benefits by the Commissioner is reviewed
to determine whether the denial is supported by substantial
evidence on the record as a whole.  Hogan v. Apfel, 239 F.3d 958,
960 (8th Cir. 2001).  "Substantial evidence is relevant evidence
that a reasonable mind would accept as adequate to support the
Commissioner's conclusion."  Maresh v. Barnhart, 431 F.3d 1073,
1074 (8th Cir. 2005); Goff v. Barnhart, 421 F.3d 785, 789 (8th
Cir. 2004)(quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir.
2000)).  Evidence that both supports and detracts from the
Commissioner's decision must be considered, but the decision may
not be reversed merely because substantial evidence supports a
contrary outcome.  Id.  See also Moad v. Massanari, 260 F.3d
887, 890 (8th Cir. 2001).


     1.   Failing to Properly Evaluate and Rely on the Treating
          Physician's Opinions.

     Wolfe claims the ALJ's disability finding and his
hypothetical question posed to the VE were inconsistent with the

                              15

opinion of his treating general practitioner, Dr. Skoch.   "A
treating physician's opinion should not ordinarily be
disregarded and is entitled to substantial weight." Singh v.
Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  If a treating
physician's opinion is well supported by medically acceptable
clinical techniques and is not inconsistent with the other
substantial evidence in the record, the opinion should be given
controlling weight. Id. Moreover, even if the ALJ concludes the
treating source's medical opinion is not entitled to controlling
weight, it may still be entitled to deference and be adopted by
the adjudicator.  SSR 96-2p, 1996 WL 374188 at *1 (S.S.A., July
2, 1996).  However, a treating physician's opinions must be
considered along with all the evidence, and when those opinions
are inconsistent or contrary to the medical evidence and record
as a whole, they are entitled to less weight. Krogmeier v.
Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002).

     The regulations require the ALJ to set forth "good reasons
in the notice of the determination or decision for the weight
given to a treating source's medical opinion(s), i.e., an
opinion(s) on the nature and severity of an individual's
impairment(s)." SSR 96-2p, 1996 WL 374188 at *5.  Factors to be
considered are: (1) the length of the treatment relationship and
the frequency of examination; (2) the nature and extent of the
treatment relationship (such as the kinds and extent of
examinations and testing); (3) supportability of the opinion (the
more a source presents evidence such as medical signs and
laboratory findings, the more weight will be given that source's
opinion); (4) the consistency of the opinion with the record as a
whole; and (5) whether the physician is a specialist, as more
weight is given to the opinion of a specialist about medical
issues relating to the area of specialty than to the opinion of a

16

source who is not a specialist.  20 C.F.R. §§ 404.1527(d) and
416.927(d).  See also SSR 96-2p, 1996 WL 374188 at *4.

The ALJ determined that "[t]o the extent that the forms
filled out by Dr. Skoch indicate [Wolfe] would not be able to
perform any work activity, they are not given significant
weight." AR 20.  The ALJ explained:

> [Dr. Skoch] only sees the claimant a couple of times a
> year for prescription renewal and noted on these forms
> that he does not see the claimant on a regular basis.
> For the most part, the doctor only gives moderate
> limitation and the forms are inconsistent.  On one form
> he indicates that the claimant could work a full 40
> hour work week and on another he indicates he couldn't
> work full-time.  He notes "situations with moderate or
> high stress would be taxing for Mr. Wolfe.  He is
> easily disturbed, becomes anxious, nervous, fidgety."
> The undersigned has taken into consideration the effect
> of stress on the claimant.  Dr. Skoch also noted that
> the claimant could understand, remember and carry out
> simple instructions.  The diagnosis of fibromyalgia is
> questionable and Dr. Skoch noted "From a physical
> capacity standpoint, Mr. Wolfe has few significant
> limitations apart from his subjective complaint of pain
> from his fibromyalgia.

AR 20.

The ALJ's conclusion that Dr. Skoch's opinions were not
entitled to controlling or substantial weight is fully supported
by the record.  Dr. Skoch had very little direct contact with
Wolfe--the majority of Wolfe's appointments were for medication
rechecks and were handled by an APRN and not Dr. Skoch.  Lack of
contact between a patient and treating physician is a relevant
factor is assessing the weight of the physician's assessment of
function, and especially so when, as in this case, determining
the nature and extent of the patient's alleged disabilities

17

relies substantially on assessing whether his subjective
complaints of pain and mental incapacity are credible.

Dr. Skoch concluded in November 2004 that due to Wolfe's
tendency to be distracted, fatigued, and anxious, he would not be
able to work fulltime.  AR 244.  However, while a "claimant's
residual functional capacity is a medical question," Lauer v.
Apfel, 245 F.3d 700, 704 (8th Cir. 2001)), "statements that a
claimant could not be gainfully employed 'are not medical
opinions but opinions on the application of the statute, a task
assigned solely to the discretion of the [Commissioner].'" Cruze
v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996)(quoting Nelson v.
Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991)).  See Brosnahan v.
Barnhart, 336 F.3d 671, 676 (8th Cir. 2003) (ALJ properly
discounted psychologist's opinion that claimant could not work);
Kroqmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)
(psychiatrist's opinion that claimant could not be gainfully
employed was not a medical opinion); Flynn v. Chater, 107 F.3d
617, 622 (8th Cir. 1997)(physician's opinion that claimant "may
not be able to work in a competitive employment situation" not
given weight).

Moreover, Dr. Skoch's November 2004 opinion is
substantially, if not completely, undermined by Wolfe's work
history.  Before receiving drug abuse treatment, Wolfe
successfully worked fulltime for fourteen years despite his
chronic mental health problems and methamphetamine addiction.
After securing Dr. Skoch's written disability evaluations in
November 2004, Wolfe became a full-time employee for Wal-Mart.
There is nothing of record to explain the discrepancy between Dr.
Skoch's opinion and Wolfe's demonstrated ability to work.  Though
Wolfe claims he resigned from Wal-Mart due, in part, to his

alleged inability to remember company policies and procedures,
Dr. Skoch placed no significant limits on Wolfe's ability to
remember and understand work instructions and procedures.   AR
241.

     To the extent that the ALJ refused to accept Dr. Skoch's
conclusion that Wolfe's physical and mental disabilities rendered
him unable to work, I conclude the ALJ provided adequate "good
reasons" for disregarding this opinion.   I therefore conclude the
ALJ's determination is not subject to reversal for failing to
give controlling or substantial weight to the opinion of Wolfe's
treating physician, Dr. Skoch, or for failing to adequately
explain why such weight was not given.

     2.   <u>Failure to Develop the Record</u>.

     Wolfe claims the ALJ's determination must be reversed
because he failed to order additional testing and examinations of
Wolfe.   Medical expert, Dr. Thomas England, testified:

     I'm going to have a little bit of difficulty with
     precise diagnosis in some areas.   One thing I would
     note is that testimony and the medical record both
     indicate complaints in the area of memory problems and
     confusion.   And I don't find any evidence of there
     having been IQ testing or memory testing done, which
     appears to be his main complaints.   And so I don't
     have anything in the way of standardized information
     about those abilities.   <u>If that is important</u>, why then
     some standardized testing <u>may be advisable</u>.

AR 315 (emphasis added).   The report of consultative examiner,
Dr. Alan Smith states that at the time of Wolfe's May 2004
examination, Wolfe  stated that "he did not take his medications
on the day of the evaluation, so that this psychologist could
observe the problems with which he is struggling."   Dr. Smith

19

stated Wolfe was "clearly hypomanic as described earlier, . . .
thought blocking is also revealed, . . . [and] Wolfe demonstrated
considerable problems with organizing his thoughts."  AR 182.
Dr. Smith opined, "[I]t is difficult to determine the extent to
which bipolar disorder, methamphetamine-induced mood disorder or
an interaction between the two accounts for current behaviors."
AR 183.

Wolfe argues that "[s]ince the ALJ failed in his duty to
develop the record by ordering memory and I.Q. testing and/or
another consultative examination, the case should be remanded for
further testing of the plaintiff."  Filing 11 (Wolfe brief), p.
12.  "The Eighth Circuit has consistently held that the ALJ has
the 'duty to develop the record fully and fairly,' even where the
claimant is represented by counsel.  Freeman v. Apfel, 208 F.3d
687, 692 (8th Cir.2000); Dozier v. Heckler, 754 F.2d 274, 276 (8th
Cir. 1985); Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir. 1984).
This includes the duty to develop the record as to the medical
opinion of the claimant's treating physician.  See, e.g. Brown v.
Bowen, 827 F.2d 311, 312 (8th Cir. 1987); Brissette v. Heckler,
730 F.2d 548, 549-50 (8th Cir. 1984); Thorne v. Califano, 607
F.2d 218, 219-20 (8th Cir. 1979).  Wolfe does not claim that
records in existence were not accumulated for the ALJ's review.
He claims additional testing and evaluation should have been
obtained.

SSR 83-15 sets forth the policy statement applicable to
evaluation of claimants with chronic mental impairments.  It
states, in part, as follows:

> The adjudicator must be alert to the particular
> problems that are often involved in evaluating mental
> impairments in individuals who have long histories of

20

repeated hospitalizations or prolonged outpatient care
with supportive therapy and high dosages of drugs.  A
single current examination may not always properly
describe an individual's sustained ability to function.
It should be viewed as one point in time in the
longitudinal picture of an individual impairment.  It
is vital to review all pertinent information describing
the individual's impairment.  It is mandatory to
attempt to obtain adequate descriptive information from
all the sources (both inpatient and outpatient) that
are treating the individual currently, as well as those
in the past, in order to properly evaluate the severity
of the impairment. . . .  In addition to obtaining
records of treatment from psychiatrists and
psychologists, it is important to obtain information
from outpatient clinics, community health centers, day
care centers, etc.

SSR 83-15, 1983 WL 31245 at *1.

As to the alleged need to order an additional consultive
examination due to the insufficiency of Dr. Smith's evaluation,
Wolfe's argument rests on claiming medical and mental testing was
needed to pinpoint the diagnosis underlying Wolfe's alleged
disabilities.  However, for the purpose of deciding if Wolfe is
entitled to social security disability benefits, the ALJ's
determination rests on whether and to what extent a disability
exists and how that disability affects his ability to work, and
not on why the disability exists.  "The ALJ is required to order
medical examinations and tests only if the medical records
presented to him do not give sufficient medical evidence to
determine whether the claimant is disabled." Barrrett v.
Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994)(emphasis added).  See
also Easttam v. Secretary of Health, Ed. and Welfare, 364 F.2d
509, 513 (8th Cir. 1966)(affirming denial of benefits where
claimant's diminished visual acuity and chest pain were of
unknown etiology, though doctor testified that further medical
testing may help in delineating the etiology of the chest

21

discomfort).  A claimant can obtain benefits for work-disabling
symptoms of unknown origin.  See e.g. <u>Turpin v. Bowen</u>, 813 F.2d
165, 168 (8th Cir. 1987)(holding benefits may be available for
chest pain and leg cramps though the etiology was unknown).
Further testing to determine whether Wolfe's symptoms were caused
by bipolar disorder or past methamphetamine use was unnecessary
in deciding whether Wolfe was, for whatever reason, disabled.

      Dr. England testified that if Wolfe's complaints of memory
problems and confusion are important, then standardized IQ and
memory testing may be advisable.  Dr. England questioned Wolfe at
the hearing to determine if such tests were performed but not
included in the record, and based on Wolfe's answers, concluded
the tests were never administered.  The question is, therefore,
whether IQ and memory tests were requisite steps in determining
if Wolfe has disabling memory impairments.

      A review of Wolfe's record reveals memory loss or low IQ
were never identified as impairments that would keep him from
performing work.  Wolfe's psychological evaluation for Valley
Hope treatment states he received an IQ score "within a range
that would suggest that he would benefit from having the program
at Valley Hope presented to him in a simple and concrete manner."
AR 175.  The Mental Capacities Evaluation by Dr. Skoch states
Wolfe has no limitations in ability to understand, remember, and
carry out short and simple instructions, and that he is not
significantly limited in his ability to carry out detailed
instructions.  AR 241.  Wolfe's complaints of memory problems
were never raised to his physicians or the physician assistants
they supervised, and were first raised with his counselor, Ms.
White, on February 28, 2005.  According to that record, Wolfe
told Ms. White he chose making donuts over baking bread at Wal-

Mart because "there were too many things to remember about . . . the different breads and he did not think that his memory was that good." AR 258. He voiced concern about keeping his job during his March 7, 2005 appointment, stating "My memory is just not good. I cannot remember a lot of the things they test on." AR 256. On the day he quit his position at Wal-Mart, he reported to Ms. White that he was overwhelmed by all the things Wal-Mart required him to remember. AR 262. However, Ms. White's June 6, 2005 letter to Wolfe's counsel notes Wolfe was anxious and fearful that he would be unable to pass Wal-Mart's required tests, but it does not specifically identify memory loss or low IQ as the reason Wolfe quit his job at Wal-Mart. AR 248.

Wolfe's mental care treatment focused on treating his depression and anxiety. Wolfe himself testified that despite his difficulty with concentration and memory, he can follow simple one- or two-step instructions. AR 303-04. In accordance with Wolfe's testimony, and lending ample credence to the statements of his treating physician and counselor, the ALJ's hypothetical question asked the vocational expert to assume Wolfe could understand and carry out simple instructions but not detailed instructions. Even with this restriction, the vocational expert testified Wolfe was able to be gainfully employed. An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. Haley v. Massanari, 258 F.3d 742, 749-50 (8th Cir. 2001). The ALJ was not required to pursue additional evaluations, memory or IQ testing of Wolfe before reaching his determination.

3.   <u>Failure to Properly Assess the Wolfe's Credibility</u>.

Wolfe argues that the ALJ simply stated that plaintiff's testimony "was not credible," (AR 20), and failed to properly consider or discuss the factors set forth in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).

Contrary to Wolfe's argument, the ALJ did not conclude Wolfe's claim and testimony lacked any credibility.  The ALJ held:

> [T]he Claimant's medically determinable impairments could reasonably be expected to produce the type of symptoms described during the course of his testimony. . . . [I]t must now be determined whether the Claimant experiences such symptoms in such intensity, and of such frequency and duration, as would preclude all types of substantial and gainful work activity.

AR 19.  The ALJ ultimately concluded that Wolfe's testimony, "insofar as it pertained to the inability to perform virtually any type of work activity on a sustained basis, was not credible."   AR 20.

To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of subjective symptoms, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions.  <u>Lowe v. Apfel</u>, 226 F.3d at 971-72 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the

24

complaints may be discounted based on inconsistencies in the
record as a whole.  Id. at 972.  The ALJ is not required to
discuss methodically each Polaski consideration, so long as the
ALJ acknowledges and examines those considerations before
discounting the subjective complaints, (id.(citing Brown
v. Chater, 87 F.3d 963, 966 (8th Cir. 1996)), and makes "express
credibility findings," and "explain[s] the record inconsistencies
that support those findings."  Dolph v. Barnhart, 308 F.3d 876,
879 (8th Cir. 2002).

     The ALJ's opinion discussed Wolfe's prior work history, the
medical reports of his treating physicians and counselor, his
ability to work at Wal-Mart for a period of time, and his
response to treatment medication.  The report states that based
on the information outlined in this discussion, the ALJ concluded
that Wolfe's claim that he was unable to work at any job was not
credible.

     Specifically, the ALJ noted that prior to treatment for
polysubstance abuse, primarily a methamphetamine addiction, Wolfe
was able to work.  When he entered substance abuse treatment, his
GAF was only 38.  However, "[s]ince becoming sober with the help
of attendance at narcotics anonymous meetings, counseling and
starting medication for depression and anxiety, his Global
Assessment of Functioning has gone from 38 to 55 indicating
improvement to the point that he could sustain employment."  AR
19.  The ALJ noted that Wolfe did, in fact, get a job at Wal-
Mart, but acknowledged that the Wal-Mart employment was not a
good job for Wolfe because of the fast pace, early morning hours,
repeated testing, and constant contact with people.  The ALJ
further noted that Dr. Skoch had indicated Wolfe needed slow
paced work--he could occasionally work at a rapid pace and could

continually perform work at a slow pace.  The ALJ disregarded the
records of Ms. White, citing inconsistencies within those
records, and explained that Dr. Smith, the consulting mental
health evaluator, concluded that Wolfe's depression and anxiety
disorders are controlled by medication.  AR 19.  Wolfe had
reported to Dr. Smith that his symptoms were managed fairly well
with medication, (AR 185), and as noted by the ALJ, Wolfe
predominant side effect from these medications is "cotton mouth."
AR 18.  The ALJ acknowledged that Wolfe's concentration and work
ability are negatively effected by stress, but further noted that
according to Dr. Skoch, Wolfe remains able to understand,
remember and carry out simple instructions.  AR 20.  Based on the
foregoing, the ALJ concluded the record did not support Wolfe's
claim that was unable to perform any type of work on a sustained
basis.

    I conclude the ALJ's determination sets forth clear and
express credibility findings with respect to Wolfe's claims, and
has sufficiently explained the record inconsistencies that
support these credibility findings.  The ALJ's determination is
not subject to reversal for failing to correctly apply the
Polaski factors.

    IT THEREFORE HEREBY IS ORDERED:  The decision of the
Commissioner of the Social Security Administration is affirmed.
Judgment in accordance with this memorandum and order will be
entered by separate document.

    DATED this 22nd day of February, 2007.

                              BY THE COURT:

                              s/ David L. Piester
                              David L. Piester
                              United States Magistrate Judge

                    26